1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TURF HOLDINGS, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>    v.<br><br>VANDERBURG CORPORATION, an Oregon Corporation, and LUTHER L. VANDERBURG, individually,<br><br>                    Defendants. | No.<br><br>COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND OTHER RELIEF |

Plaintiff Turf Holdings, Inc. alleges as follows:

## I.    NATURE OF ACTION

1.    This is an action for trade dress and trademark infringement under the trademark

laws of the United States, breach of contract, unfair competition, and violation of Washington's

Uniform Trade Secrets Act against Luther L. Vanderburg and Vanderburg Corporation

(collectively, "Defendants"). Plaintiff seeks, among other things, a preliminary and permanent

injunction (i) enjoining Defendants from wrongful and unlawful use of Plaintiff's protected trade

dress, trademark, and trade secrets (including customer list), and (ii) enforcing Defendants' post-

termination obligations set forth in the Franchise Agreement entered into by and between

COMPLAINT  – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Plaintiff and Defendants.  Plaintiff also seeks damages, including for significant past-due monies owed.

## II.    THE PARTIES

2.    Plaintiff Turf Holdings is a Delaware corporation with its principal place of business in Scarborough, Ontario (and formerly Washington), that grants franchises to qualified persons to operate lawn care businesses using its unique and comprehensive lawn care business system and "Weed Man" mark.

3.    Defendant Luther Vanderburg is an adult individual who, upon information and belief, is a citizen and resident of the State of Oregon.

4.    Defendant Vanderburg Corporation is an Oregon corporation that is owned, operated, and personally guaranteed by Luther Vanderburg.

## III.    JURISDICTION AND VENUE

5.    This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338, in that this is a civil action involving claims arising under the laws of the United States, including an Act of Congress relating to trademarks.  All other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy, and this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

6.    This Court also has original subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), in that this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and a citizen of a foreign state.

7.    Personal jurisdiction and venue are proper in this Court under 28 U.S.C. § 1391 and Section 10.7 of the Franchise Agreement.  The parties specifically agreed in Section 10.7 of the Franchise Agreement to jurisdiction and venue in Washington.  Further, a substantial part of the events giving rise to this action occurred in the Western District of Washington, as the

COMPLAINT  – 2

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Franchise Agreement was executed in Bellevue, Washington, which was the location of Plaintiff's headquarters at that time.

### IV.    PLAINTIFF'S SYSTEM, TRADEMARK, TRADE DRESS, AND TRADE SECRETS

8.    Turf Management Systems Inc. ("Turf Management") has developed and owns a unique and comprehensive business system for the establishment of lawn care businesses focusing on the eradication of weeds (the "System"). The System includes, among other things, the use of the "Weed Man" mark. Plaintiff has the exclusive right in the United States to use and to license others to use the System in the establishment and operation of "Weed Man" lawn care businesses.

9.    Pursuant to franchise agreements entered into by and between Plaintiff and its authorized and approved licensees, Plaintiff grants licenses to qualified persons to own and operate "Weed Man" lawn care businesses using the System, but only in such manner as is expressly authorized by Plaintiff.

10.    The System consists of Plaintiff's confidential information and trade secrets including its distinctive techniques, expertise, and knowledge regarding the establishment, operation, and promotion of lawn care services. Among other things, the System includes lawn care techniques and business format and systems and focuses on the use of certain quality products, such as a particular fertilizer blend made to Plaintiff's specifications.

11.    Plaintiff's business is valued based in part on the number of customers and the total revenues represented by those customers over time. Therefore, a key factor in the success of Plaintiff's business is the acquisition and retention of lawn care customers by its licensees, which results from the goodwill associated with, and generated by, the trademarks and System. Access to information about "Weed Man" customers contained in the "customer lists" maintained by Plaintiff's licensees, including their names, addresses, telephone numbers, and account information, is vital to the continuing success of Plaintiff's business. It is also critical

COMPLAINT – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

for Plaintiff to prevent others from gaining access to the data contained in these customer lists, which could be used to divert those customers from "Weed Man" to other competing lawn care companies. Accordingly, a trade secret belonging to the franchisor is the customer list and account information developed through the operation of the franchised business and an obligation of Plaintiff's licensees is that they maintain accurate customer information, and that they provide such information to Plaintiff each year, upon request, and upon termination.

12.    The System includes the use of certain distinctive characteristics ("Turf's Trade Dress") that distinguish "Weed Man" lawn care businesses from other lawn care businesses. An integral part of the System is the use of Turf's Trade Dress, which includes certain distinctive equipment, including service trucks with a yellow cab and a dark green base (representing a dandelion) and a unique tank and hose reel configuration, which consists of two horizontally-positioned aluminum tanks banded together in the center with two hose reels behind, one on the driver side and one on the passenger side of the truck  Another key aspect of the System is the use of certain trademarks, including the "Weed Man" mark, which is a registered trademark. Turf's Trade Dress creates and reflects the total image of a "Weed Man" lawn care business.

13.    Turf's Trade Dress is nonfunctional:  it consists of arbitrary embellishments primarily adopted for purposes of identification and individuality, to identify and distinguish the services offered by "Weed Man" lawn care businesses.

14.    Plaintiff and authorized "Weed Man" licensees have continuously used the System in interstate commerce in connection with the promotion, sale, and franchising of "Weed Man" lawn care businesses throughout the United States for 15 years.

15.    The use of the System, including the trade dress and marks, distinguishes "Weed Man" lawn care businesses and services from those established, run by, and sold by others.

16.    Plaintiff and its authorized and approved licensees have extensively advertised and promoted "Weed Man" lawn care businesses and the services they offer using the System and marks throughout the United States and through various media.  As a result of such efforts

COMPLAINT  – 4

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

and the considerable money spent in connection therewith, the services offered by Plaintiff and its licensees under the System and marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States.  There are approximately 107 licensed "Weed Man" businesses in the United States.

## V.    THE FRANCHISE AGREEMENT

17.    On November 1, 1996, Plaintiff entered into a written franchise agreement with an Oregon company known as Hunt-Kestek Corporation (the "Franchise Agreement").  A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A.

18.    Pursuant to the Franchise Agreement, Plaintiff granted Hunt-Kestek, which was owned and operated by Tom Hunt and Jeff Kestek, a license to use Plaintiff's System and marks in connection with the operation of a lawn care business in Clackamas County, Oregon.  Hunt-Kestek opened and operated a "Weed Man" lawn care business at 15575 SW 74th Avenue, Suite #3 in Tigard, Clackamas County, Oregon.

19.    Sometime after 1996, Defendant Luther Vanderburg became involved in managing the Weed Man business owned by Hunt-Kestek.  Mr. Kestek left the company, and Hunt-Kestek changed its name to Hunt-Vanderburg Corporation.

20.    Upon information and belief, in or about 2002, Hunt sold all interests in the company to Luther Vanderburg.  In March 2002, the name of the company was changed to "Vanderburg Corporation."  At that time, neither Tom Hunt nor Luther Vanderburg advised Plaintiff of the change in ownership or sought Plaintiff's consent as required by Section 7.2 of the Franchise Agreement.

21.    When Plaintiff learned that Luther Vanderburg had purchased the company operating the "Weed Man" business (formerly owned and operated by Hunt-Kestek), which company continued to use the System and marks pursuant to the Franchise Agreement, Plaintiff agreed to consent to the change in ownership so long as Luther Vanderburg personally guaranteed and agreed to be bound by all of the company's obligations under the Franchise

COMPLAINT  – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

Agreement.  On or about April 13, 2005, Plaintiff and Defendants executed an Assignment

Consent Agreement ("Assignment") whereby Plaintiff consented to the ownership transfer and

the parties ratified that Vanderburg Corporation was the franchisee of record.  A true and correct

copy of the Assignment is attached hereto as Exhibit B.

     22.    Defendants agreed to the terms of the Franchise Agreement, including, but not

limited to, the following:

     a.    Pursuant to Section 3.17, Defendants agreed to provide Plaintiff with unaudited

financial statements within 30 days of year end.  Defendants also agreed to allow Plaintiff to

inspect the records of their "Weed Man" business, including the bookkeeping and accounting

records, financial statements, tax records, invoices, and bank deposit records, at any time.  Ex. A

¶ 4.6.

     b.    Pursuant to Section 3.7, Defendants acknowledged that an essential element of the

System is the uniform quality of the equipment, products, supplies, and material to be used in

operating a "Weed Man" lawn care business.

     c.    Pursuant to Sections 4.2 and 4.3, Defendants agreed to pay royalties, service fees,

and advertising contributions to Plaintiff.

     d.    Pursuant to Section 5.2, Defendants acknowledged that they had no rights in the

marks owned by Turf Management except the right to use them pursuant to the Franchise

Agreement, and that all goodwill arising from their use of the marks would inure to and belong

only to Turf Management.

     e.    Pursuant to Section 6.1, Defendants agreed not to use Plaintiff's confidential

information or trade secrets except to operate their "Weed Man" business in accordance with the

Franchise Agreement.

     f.    Pursuant to Section 6.6, Defendants expressly acknowledged that the System is

unique and that the restrictive competition covenants set forth in the Franchise Agreement are

necessary to protect the System and the goodwill generated by the licensees that use the System.

COMPLAINT  – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

g.     Section 8 identifies certain circumstances in which the licensee will be in default, including the failure to pay the licensor when a payment is due. Ex. A ¶ 8.1(b).  The Franchise Agreement provides for a 10-day cure period.  If, after the 10-day cure period, the licensee has not cured the default, the Franchise Agreement may be terminated.  Ex. A ¶ 8.2(g).

h.     Section 9 identifies the licensee's post-termination obligations, including but not limited to:

- Immediately stop using the System and the Marks;

- Remove the Marks from all vehicles, equipment, and signs, and make other changes to the external appearance of the licensee's vehicles as required by the licensor to minimize their identification with the System;

- Give the licensor an accurate list of the names and addresses of all of the licensee's customers during the previous 12 months;

- Give the licensor the option to purchase the fixtures, vehicles, equipment, signs, supplies, materials, and merchandise used in the operation of the licensee's "Weed Man" lawn care business.

i.     Pursuant to Section 9.6, Defendants acknowledged that their delay or refusal to cease using the marks on termination of the Franchise Agreement will cause serious damage to Plaintiff that may be impossible to measure monetarily, thereby entitling Plaintiff to injunctive relief.

j.     In addition, Section 6.3 provides that upon termination of the Franchise Agreement for any reason, the licensee will not be engaged in the development, operation, management, or franchising of any business deriving more than 10% of its gross operating revenue from providing lawn care services for a period of two years in Clackamas County, Oregon ("Non-competition Covenant").

k.     Pursuant to Section 6.4, Defendants agreed not to divert or attempt to divert any of the customers of their "Weed Man" business to any competing business for two years

COMPLAINT  – 7

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

following the expiration, termination, or assignment of their license to use the System ("Non-solicitation Covenant").

l.    Pursuant to Section 10.1, Defendants agreed to indemnify Plaintiff "on a full recovery basis (including all attorneys fees and disbursements) against all liability, loss, damages, costs and expenses which [Plaintiff] may sustain, suffer or incur as a result of [Defendants'] breach of this Agreement . . . ."

m.    Section 10.7 of the Franchise Agreement expressly provides for the application of Washington law and jurisdiction of Washington courts in the event of legal action to enforce its terms.

23.    In connection with the execution of the Assignment, on March 8, 2005, Luther Vanderburg executed a Guaranty Agreement, whereby he personally guaranteed the payment of all debts owed to Plaintiff pursuant to the Franchise Agreement and the timely performance of each term and obligation under the Franchise Agreement.  A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit C.

24.    The Guaranty Agreement executed by Luther Vanderburg provides for the payment of attorneys' fees in the event of litigation regarding the guaranty, stating:  "if this continuing guaranty is placed with an attorney or if collected by suit or through any probate, bankruptcy or other court, to pay all court costs and reasonable attorney's fees, together with any and all expenses incurred by Franchisor or its affiliate, subsidiary or division."

## VI.    DEFENDANTS' BREACH AND PLAINTIFF'S TERMINATION OF THE FRANCHISE AGREEMENT

25.    After executing the Assignment and Guaranty Agreement in 2005, Defendants continued to operate a "Weed Man" lawn care service using the System until Plaintiff terminated the Franchise Agreement effective December 31, 2009.

26.    Defendants regularly and continuously failed to pay royalty fees, renewal fees, and advertising contributions owed to Plaintiff under the terms of the Franchise Agreement,

COMPLAINT – 8

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

Assignment, and Guaranty Agreement. Beginning in 2004, Plaintiff advised Luther Vanderburg on multiple occasions that he owed Plaintiff royalty and other fees, and that such fees were past-due and continuing to accrue. Defendants regularly acknowledged their debt to Plaintiff and promised to pay the same in the future, but consistently failed or refused to do so. As of November, 2009, Defendants owed Plaintiff in excess of $125,000.

27.    Despite repeated requests by Plaintiff, Defendants failed to cure their monetary defaults.

28.    Consistent with the express terms of Sections 8.1 and 8.2 of the Franchise Agreement, and with the notice provision contained in Section 10.6, on November 1, 2009, Plaintiff sent Defendants a Notice of Default and Termination ("Notice") via certified mail.

29.    The Notice allowed Defendants until December 31, 2009, to cure their default and also offered that Defendants could propose an acceptable payment plan or sell the business to a third party (subject to Plaintiff's approval). The Notice further provided that if Defendants took no such action, the Franchise Agreement would terminate effective at close of business on December 31, 2009. In that event, the Notice reminded Defendants of their post-termination obligations pursuant to the Franchise Agreement and demanded compliance with the same and further stated that Defendants were and would continue to be liable for payment of royalties and other fees due to Plaintiff.

30.    Defendants did not pay the amount owed to Plaintiff, propose a payment plan, or seek Plaintiff's approval to transfer the business to a third party prior to December 31, 2009.

## VII.    DEFENDANTS' BREACH OF POST-TERMINATION OBLIGATIONS AND INFRINGEMENT

31.    After December 31, 2009, Plaintiff attempted to work with Defendants to ensure an orderly exit from the system and compliance with the post-termination obligations of the Franchise Agreement, including proposing a major compromise on the monetary obligations. As it became apparent that the parties would not reach a global resolution, Plaintiff repeatedly

COMPLAINT – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

73127-0001/LEGAL17869947.1

requested that Defendants comply with their post-termination obligations under the Franchise

Agreement, but Defendants failed to comply with all of their obligations. Defendants failed to

comply with their post-termination obligations and are infringing on Plaintiff's trademarks, trade

dress, and trade secrets.

32.    Defendants refused to de-identify their business within three days as required by

Section 9.2 of the Franchise Agreement, and have failed to do so to date. Specifically,

Defendants failed to completely remove the "Weed Man" mark from the door of their business

and failed to change the vehicles' distinctive green and yellow color scheme and tank

configuration. Upon information and belief, the "Weed Man" mark has not been completely

removed from the vehicles, as typically the outline of the mark can still be seen after removal of

the decal containing the mark unless the vehicles are re-painted, which Defendants have not

done.

33.    Defendants also failed to immediately cease using Plaintiff's System, including

the "Weed Man" mark, Plaintiff's special fertilizer blend, customer list, other trade secrets, and

other confidential information, and continue to do so today.

34.    Defendants failed to agree to abide by the terms of the Non-competition Covenant

in Section 6.3 of the Franchise Agreement, which provides that Defendants will not operate a

competing business in Clackamas County for two years after termination of the Franchise

Agreement, and with the terms of the Non-solicitation Covenant in Section 6.4, which provides

that Defendants will not attempt to divert any customers of their former "Weed Man" business to

any other competitive business for two years after termination of the Franchise Agreement.

Although Plaintiff advised Vanderburg that it had made arrangements to provide service to

Defendants' pre-paid customers, Vanderburg stated that he would continue to provide service to

those customers. Upon information and belief, Defendants continue to operate, or plan to

continue to operate, a competing lawn care business from the same location as their former

"Weed Man" lawn care business and offer competing services to all of the customers of

COMPLAINT – 10

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

73127-0001/LEGAL17869947.1

Defendants' former "Weed Man" business in direct violation of the Non-competition Covenant and the Non-solicitation Covenant.

35.    Defendants' use of the System is without Plaintiff's license or consent, and has caused or is likely to cause mistake, confusion, or deception in the minds of the public as to source, affiliation, and sponsorship.  Defendants' continued use of Plaintiff's System in the lawn care industry will deceive consumers into concluding that Defendants and the lawn care services offered by them, are associated with Turf Holdings, are subject to Turf Holding's supervision, and are sponsored or endorsed by Turf Holdings.

36.    Defendants refused to allow Plaintiff the option to purchase the equipment, materials, and vehicles used in operation of Defendants' "Weed Man" lawn care business pursuant to Section 9.4 of the Franchise Agreement and pursuant to Plaintiff's notice of its intent to exercise its right under that provision in its November 1 Notice.  On information and belief and based on inconsistent representations, Defendants may have either sold or offered to sell some of the vehicles and equipment to a third party for use (probably by Vanderburg) in the competing business using Plaintiff's trade secrets and trade dress.

37.    Defendants failed to pay all amounts owing to Plaintiff within seven days of termination pursuant to Section 9.3 of the Franchise Agreement.

38.    Defendants failed to send Plaintiff an accurate and complete customer list with account information for the previous twelve months.

## VIII.    FIRST CAUSE OF ACTION:
## LANHAM ACT, 15 U.S.C. § 1125(a) – TRADE DRESS INFRINGEMENT

39.    Plaintiff realleges and incorporates by reference paragraphs 1-38 above.

40.    Plaintiff's System includes and constitutes protected trade dress with regard to the operation of a lawn care business.

41.    Plaintiff uses and licenses others to use its System in association with the operation of "Weed Man" lawn care businesses in the United States.  Plaintiff licensed

COMPLAINT  – 11

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

Defendants to use the System in the context of their authorized "Weed Man" lawn care business in Tigard, Oregon, pursuant to a Franchise Agreement executed in the State of Washington.

42.    After Plaintiff terminated Defendants' right to use the System, Defendants have continued to use the System in relation to the operation of a competing lawn care business in Tigard, Oregon, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

43.    Defendants' use of the System is without the consent of Plaintiff.

44.    Plaintiff's trade dress is non-functional.

45.    Plaintiff's System, including its trade dress, is inherently distinctive and has acquired secondary meaning.

46.    Defendants' use of the System is likely to cause confusion among ordinary consumers as to the source of Plaintiff's and Defendants' services.

47.    As a direct and proximate result of Defendants' infringement, Plaintiff has been and is likely to be substantially injured in its business, including damage to its goodwill and reputation, resulting in lost revenues and profits.

48.    Plaintiff has no adequate remedy at law because the System is unique and represents to the public Plaintiff's identity, reputation, and goodwill, such that damages alone cannot fully compensate Plaintiff for Defendants' misconduct.

49.    Unless enjoined by the Court, Defendants and those acting in concert with them will continue to use and infringe the System to Plaintiff's irreparable injury. This threat of future injury to Plaintiff's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the Marks, and to ameliorate and mitigate Plaintiff's injuries.

## IX.    SECOND CAUSE OF ACTION:
## TRADEMARK INFRINGEMENT

50.    Plaintiff realleges and incorporates by reference paragraphs 1-49 above.

51.    Plaintiff's "Weed Man" mark is a registered trademark.

COMPLAINT – 12

73127-0001/LEGAL17869947.1

52.     Plaintiff granted Defendants the right to use its "Weed Man" mark pursuant to the terms of the parties' Franchise Agreement. The Franchise Agreement terminated on December 31, 2009.

53.     Upon information and belief, Defendants continue to operate what is now a competitive business from the same location and using the same service vehicles as their former "Weed Man" business. The outline of the "Weed Man" mark is still visible on the door of Defendants' business and may be visible on lawn care service vehicles owned by Defendants.

54.     Defendants have failed to perform their post-termination obligations under the Franchise Agreement, including their obligation to immediately cease using Plaintiff's marks.

55.     Defendants' actions constitute an infringing use in interstate commerce of Plaintiff's "Weed Man" mark. Defendants' failure to completely remove the "Weed Man" mark is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(1).

56.     As a direct and proximate result of Defendants' infringement, Plaintiff has been, and will continue to be, substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

57.     Plaintiff has no adequate remedy at law because its "Weed Man" mark is unique and represents to the public the identity, reputation, and goodwill of Plaintiff such that damages alone cannot fully compensate Plaintiff for Defendants' misconduct.

58.     Unless enjoined by the Court, Defendants and those acting in concert with them will continue to use and infringe Plaintiff's "Weed Man" mark, to the irreparable injury of Plaintiff. This threat of future injury to Plaintiff's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the "Weed Man" mark, and to ameliorate and mitigate injuries to Plaintiff.

COMPLAINT – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

73127-0001/LEGAL17869947.1

## X.    THIRD CAUSE OF ACTION
## UNFAIR BUSINESS PRACTICES

59.    Plaintiff realleges and incorporates by reference paragraphs 1-58 above.

60.    The foregoing acts of Defendants constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of RCW 19.86.020.

61.    Defendants' conduct affects and is contrary to the public interest, tends to mislead a substantial portion of the public, and has injured and, unless enjoined, will continue to injure Plaintiff's business and property.

62.    Plaintiff has been and will continue to be damaged, and Defendants have been unjustly enriched, by such acts in an amount to be proved at trial.

## XI.    FOURTH CAUSE OF ACTION:
## UNIFORM TRADE SECRETS ACT

63.    Plaintiff realleges and incorporates by reference paragraphs 1-62 above.

64.    As set forth above, Defendants have and will continue to violate Washington's Uniform Trade Secrets Act, Chapter 19.108 RCW, by operating a competing lawn care business using Plaintiff's System including, but not limited to, the customer list from Defendants' former "Weed Man" business.

65.    Plaintiff's System includes various trade secrets and other confidential and proprietary information, including Plaintiff's methodology of and business plan for operating a successful lawn care business, weed eradication and other lawn care techniques, and specified fertilizer blend.  Plaintiff takes reasonable precautions to protect these trade secrets and to guard the secrecy of the information.

66.    The customer list for the "Weed Man" business formerly operated by Defendants is a protected trade secret belonging to Plaintiff.  This customer list is a compilation of information not readily ascertainable from public sources, is valuable because unknown to others

COMPLAINT  – 14

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

in the lawn care industry, and reasonable efforts have been made to protect the secrecy of the information.

67.    Plaintiff licensed Defendants to use the System, including the trade secrets and other confidential and proprietary information, pursuant to the parties' Franchise Agreement. Upon termination of the Franchise Agreement on December 31, 2009, Defendants were no longer authorized to use the System.

68.    Upon termination of the Franchise Agreement, Defendants were required to give Plaintiff the customer list for their former "Weed Man" business and refrain from attempting to use the list or customer contacts developed during the authorized operation of the business to divert any "Weed Man" customers to any competing lawn care business for two years.

69.    Defendant Luther Vanderburg advised Plaintiff that he intends to continue to provide lawn care services to customers of his former "Weed Man" lawn care business, in particular those customers who prepaid for services for 2010.  Upon information and belief, Defendants have continued and plan to continue to operate a lawn care business using the System, including Plaintiff's trade secrets and other confidential and proprietary information. Further, Defendants intend to market their competitive business to customers on the customer list compiled during Defendants' operation of their "Weed Man" lawn care business.  Such use by Defendants is a misappropriation of Plaintiff's trade secrets.

70.    As a result of Defendants' misappropriation, Plaintiff has been and will continue to be substantially and irreparably harmed in that Defendants will have received and will continue to receive money that in justice and fairness belong to Plaintiff.

## XII.    FIFTH CAUSE OF ACTION:
## BREACH OF CONTRACT – POST TERMINATION OBLIGATIONS

71.    Plaintiff realleges and incorporates by reference paragraphs 1-70 above.

72.    Plaintiff and Defendants executed an Assignment whereby Defendants confirmed their assumption of the rights and obligations under the Franchise Agreement, a valid contract.

COMPLAINT  – 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

Defendant Luther Vanderburg executed a Guaranty Agreement, whereby he personally guaranteed the payment of amounts due or to become due to Plaintiff under the Franchise Agreement and the timely performance of the terms, covenants, and obligations set forth in the Franchise Agreement.

73.    Plaintiff performed all of its obligations under the Franchise Agreement.

74.    Defendants have failed and refused to perform their post-termination obligations under the Franchise Agreement, including their obligations to (1) pay all royalties and other amounts owed Plaintiff; (2) cease use of trade secrets, marks, and other trade dress belonging to Plaintiff; (3) allow Plaintiff to exercise its purchase option for the fixtures, equipment, materials, and vehicles used in Defendants' former "Weed Man" lawn care business; and (4) otherwise cease use of the System.  In addition, Defendants' continued operation of a lawn care business at the same location as their former franchised "Weed Man" lawn care business and providing service to clients of their former "Weed Man" business violates and constitutes and breach of the Non-competition Covenant and Non-solicitation Covenant of the Franchise Agreement.

75.    Defendants' breaches of their post-termination obligations have injured, and unless and until Defendants are ordered to perform their post-termination obligations under the Franchise Agreement, will continue to injure Plaintiff in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

76.    Plaintiff has no adequate remedy at law for these injuries, and this threat of future injury to Plaintiff's business identity, goodwill, and reputation requires that Defendants be ordered to perform their contractual post-termination obligations under the Franchise Agreement to prevent their continued breach and to ameliorate and mitigate Plaintiff's injuries.

## XIII.  SIXTH CAUSE OF ACTION:
### BREACH OF CONTRACT – PAST DUE AMOUNTS

77.    Plaintiff realleges and incorporates by reference paragraphs 1-76 above.

COMPLAINT  – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

78.    Plaintiff and Defendants executed an Assignment whereby Defendants confirmed the assumption of the rights and obligations under the Franchise Agreement, a valid contract. Defendant Luther Vanderburg executed a Guaranty Agreement, whereby he personally guaranteed the payment of amounts due or to become due to Plaintiff under the Franchise Agreement and the timely performance of the terms, covenants, and obligations set forth in the Franchise Agreement.

79.    Plaintiff performed all of its obligations under the Franchise Agreement.

80.    Under the terms of the Franchise Agreement, Defendants must pay royalty fees, renewal fees, and advertising contributions to Plaintiff.  Defendants have failed to pay all of the fees owed to Plaintiff.

81.    Defendants breached the Franchise Agreement by failing to pay all amounts owed to Plaintiff under the terms of the Franchise Agreement.

82.    Defendants' failure to pay all amounts owed to Plaintiff under the terms of the Franchise Agreement has damaged Plaintiff.

83.    Pursuant to Section 10.1 of the Franchise Agreement, Defendants agreed to pay all of Plaintiff's costs, including attorneys' fees, incurred as a result of Defendants' breach of the Franchise Agreement.

84.    Pursuant to the Guaranty Agreement, Luther Vanderburg is personal liable for amounts owed to Plaintiff by Vanderburg Corporation and for Plaintiff's court costs, including attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief against Defendants:

1.    An Order preliminarily and permanently enjoining Defendants, their agents, servants, employees, and those people acting in concert with them from using Plaintiff's System, including its "Weed Man" mark, trade secrets, and trade dress.

COMPLAINT – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

2.    An Order preliminarily and permanently enjoining Defendants, their agents, servants, employees, and those people acting in concert with them from using the customer list and customer accounts for Defendants' former "Weed Man" business, and from providing any competing services to any customer contact developed during the franchise relationship regardless of location for a period of two (2) years from the December 31, 2009, termination date of the Franchise Agreement.

3.    An Order preliminarily and permanently enjoining Defendants, their agents, servants and employees, and those people acting in concert with them from directly or indirectly engaging in the development, operation, management, or franchising of any business located in Clackamas County, Oregon, that derives more than 10% of its gross operating revenue from the provision of lawn care services for a period of two (2) years from the December 31, 2009, termination date of the Franchise Agreement.

4.    An Order requiring Defendants to immediately perform their contractual post-termination obligations under the Franchise Agreement, including, without limitation, their obligations to:

a.    Pay all royalties and other amounts owed Plaintiff pursuant to the Franchise Agreement;

b.    Provide Plaintiff with the option to purchase such fixtures, vehicles, equipment, supplies, materials, and merchandise used in Defendants' "Weed Man" lawn care business as Plaintiff designates, and (with respect to those items not purchased and/or in the alternative), completely remove all of Plaintiff's marks and trade dress from said fixtures, vehicles, equipment, supplies, materials, and merchandise.

c.    Provide Plaintiff with the databases containing complete and accurate information regarding Defendants' lawn care customers for the past twelve months, including their names, contact information, and payment records.

5.    An award of damages in an amount to be determined at trial;

COMPLAINT  – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73127-0001/LEGAL17869947.1

6.    An award of costs and expenses, including reasonable attorneys' fees, incurred by Plaintiff in connection with this action as provided for by statute, the Franchise Agreement, and the Guaranty Agreement.

7.    Such other and further relief as the Court deems just and proper.

DATED:  March 19, 2010

s/ Katherine E. Page
Katherine E. Page, WSBA No. 32903
KPage@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Plaintiff Turf Holdings, Inc.

COMPLAINT  – 19

73127-0001/LEGAL17869947.1

# EXHIBIT A

**UNIT FRANCHISE AGREEMENT**

**B E T W E E N:**

**TURF HOLDINGS INC.**

- and -

**HUNT-KESTEK CORP**

## TABLE OF CONTENTS

1  THE LICENSE .................................................................................................................2

2 - LICENSOR'S SERVICES ...............................................................................................3

3 - LICENSEE'S CONTINUING OBLIGATIONS ............................................................5

4 - FEES AND PAYMENTS ...............................................................................................10

5 - USE OF THE MARKS ..................................................................................................12

6 - RESTRICTIVE COMPETITION COVENANTS........................................................13

7 - ASSIGNMENT .............................................................................................................15

8 - TERMINATION ...........................................................................................................16

9 - CONSEQUENCES OF TERMINATION ....................................................................18

10 - GENERAL CONTRACT PROVISIONS....................................................................19

11 - GUARANTY AND INDEMNITY..............................................................................23

12 - ACKNOWLEDGMENTS............................................................................................23

## FRANCHISE AGREEMENT

THIS AGREEMENT dated November 1, 1996 is between **TURF HOLDINGS INC.**, a corporation incorporated under the laws of Delaware ("Licensor"), with head office at 12951 Bel-Red Road, Suite 195, Bellevue, Washington 98005, and:

**HUNT-KESTEK CORP**

a Corporation incorporated under the laws of Oregon ("Licensee"), with head office at: 5 Center Pointe Drive, Suite 100, Lake Oswego, OR 97035, and:

**JEFF KESTEK** who resides at 1026 Rosemont Road, West Linn, OR, 97068 and:

**TOM HUNT** who resides at: 11633 SE 64th Avenue, Milwaukie, OR, 97222  503-786-7367

### BACKGROUND

Turf Management Systems Inc. ("Turf Management"), a Canadian corporation with head office at 2399 Royal Windsor Drive, Mississauga, Ontario, L5J 1K9 has developed and owns a comprehensive business system (the "System") for the care of lawns, with particular emphasis on the eradication of weeds. The System stresses quality of products used, prompt and courteous customer service, and guaranteed results. The System includes a uniform business format and the use of standardized signs, equipment and advertising, and the service mark *Weed Man*, certain other service marks listed in Schedule "1" and such other trademarks, service marks, trade names and logos which Licensor may subsequently own or be licensed to use and which it designates as forming part of the System. All of these trademarks, service marks, trade names and logos are referred to in this Agreement as the "Marks".

Pursuant to an agreement with Turf Management (the "Master License Agreement"), Licensor has the exclusive right throughout the United States to use and to license others to use the System in the operation of lawn-care businesses.

Licensee wishes to have a license to operate a lawn-care business using the System, has applied to Licensor for such a license, and acknowledges that an essential part of this license is Licensee's strict adherence to Turf Management's and to Licensor's specifications, standards, operating procedures, rules and policies regarding the use of the System, all of which are designed to ensure that lawn care businesses which are operated in association with the Marks present to the public a uniform, high-quality business operation, thereby providing the basis for the valuable goodwill and public acceptance of the System. These specifications, standards, policies and operating procedures include but are not limited to using only lawn care products and equipment which have been authorized and approved by Turf Management and by Licensor.

Guarantors are all of the stockholders of Licensee, and in order to induce Licensor to grant the license to Licensee have agreed to execute this Agreement as guarantors and indemnifiers of Licensee's obligations to Licensor.

## AGREEMENT

For valuable consideration now given by each of the parties to the others (the receipt and sufficiency of which the parties acknowledge), the parties agree as follows:

## 1    THE LICENSE

### 1.1    Grant of Rights

Licensor grants to Licensee the right and license (the "Licensed Right") to use the System, including the Marks, to operate a lawn-care business to be established by Licensee (the "Licensed Business") within the geographic area described in Schedule "2" (the "Territory"), and to advise to the public that Licensee is an authorized *Weed Man* licensee of Licensor, all on the terms of this Agreement.

### 1.2    Term and Renewal of Licensed Right

The Licensed Right starts on the date that this Agreement is signed by Licensor, and continues for an initial term of ten years, but subject to early termination as provided in Article 8, 8.2. Licensee may renew the Licensed Right for one additional period of ten years, if Licensee has satisfied all of the following:

(a)    Licensee must have given Licensor notice of its intention to renew at least nine months (but not more than 12 months) before the expiration of the initial term of this Agreement.

(b)    Throughout the initial term of this Agreement Licensee must have substantially complied with all of its obligations to Licensor (whether or not under this Agreement) and must have paid all amounts owing to the trade creditors of the Licensed Business.

(c)    Licensee must have purchased or leased and installed whatever new equipment Licensor shall reasonably require, so that Licensee's equipment (in this Agreement the word "equipment" includes motor vehicles) is equivalent to the equipment which Licensor is requiring new *Weed Man* licensees to have at the expiration of the initial term of this Agreement.

(d)    Those personnel of Licensee which Licensor designates must have satisfied the requirements of the training program which Licensor then requires of new *Weed Man* licensees.

(e)    At the end of the initial term Licensee must execute the form of *Weed Man* license agreement then being used by Licensor to grant new *Weed Man* franchises, the terms of which may differ substantially from those in this Agreement. The terms of the new agreement will supersede the terms of this Agreements.

(f)    The Licensee shall have executed, at the time of such renewal, a general release of any claims it may have against the Licensor and the officers, directors, agents and employees of the Licensor, in form and terms prescribed by the Licensor.

(g)    The Licensee pays to the Licensor, a renewal fee in an amount equal to fifty percent (50%) of the then current initial franchise fee.

## 1.3    Territorial Rights

For as long as the Licensed Right continues in effect and Licensee is not in breach of this Agreement, Licensor will not itself operate or license anyone else to operate a lawn-care business anywhere within the Territory. In all other respects Licensor has the absolute right to conduct whatever business it wishes anywhere within the Territory or elsewhere within the United States.

## 1.4    System Changes

Licensee acknowledges that additions and other System modifications will be needed from time to time to preserve and enhance the public image of the System, to accommodate new technologies and to respond to changing customer wishes. Licensee agrees that Licensor has the continuing right to add to, delete from or otherwise change the System, including without limitation adding or changing such things as trademarks, products and services offered for sale to customers, marketing and selling techniques, equipment specifications, and the standards, policies and operating procedures for the Licensed Business. Licensee agrees to promptly implement and use all such System modifications, at Licensee's cost.

## 2 -    LICENSOR'S SERVICES

## 2.1    Initial Training

Licensor will offer an initial training program to Guarantors, and to such other employees of Licensee as Licensor designates (if any), on the proper use of the System in the operation of the Licensed Business. Training will be given for whatever period Licensor reasonably deems is necessary, at a location designated by Licensor. Licensee is responsible for the costs of travel, meals and lodging and for any wages payable to those of its personnel who attend training. Licensor need not compensate any trainee for services rendered by him during training.

## 2.2    System Manual

Licensor will loan to Licensee one copy of each of Licensor's confidential System operation manuals, which have been prepared by Turf Management or by Licensor for use by all System licensees. These manuals contain detailed information relating to the operation of a lawn-care business using the System, and shall remain Licensor's property.

## 2.3    Refresher Training

Licensor will hold periodic seminars, refresher training programs and an Annual Convention of licensees. Guarantors and such other employees of the Licensed Business as are designated by Licensor shall attend at and participate in the Annual Convention and in such management seminars

and training or refresher courses as Licensor specifies from time to time. However, Licensor will not require such persons to attend more than two such seminars or courses per calendar quarter.

### 2.4    Continuing Advice and Guidance

For as long as the License Right continues, Licensor shall offer Licensee such advice and technical guidance as Licensee reasonably requires to operate the Licensed Business in accordance with the System requirements. Licensor shall communicate to Licensee its know-how and its new developments, techniques and improvements in the areas of lawn-care and weed eradication which are pertinent to operating the Licensed Business. Without limitation, Licensor shall make available to Licensee whatever additional services, facilities, rights and privileges it makes generally available to all *Weed Man* licensees using the System.

### 2.5    Special Assistance

On reasonable written request of Licensee (as determined by Licensor), Licensor will try to help Licensee solve specific problems encountered in the operation of the Licensed Business which are beyond the scope of the support contemplated by Section 2.4. Unless Licensor and Licensee make special arrangements at the time that Licensee requests help, Licensee shall reimburse Licensor on request for the time spent by Licensor's personnel (at their then-current billing rates) and for Licensor's out-of-pocket expenses of so assisting Licensee, including the cost of travel, meals and lodging for Licensor's personnel involved.

### 2.6    Advertising Programs

Licensor will formulate, develop, produce and conduct advertising and promotional programs, commercial prints, merchandising materials, special promotions and similar advertising and promotional materials (collectively called the "Advertising Programs"), which are designed to enhance public recognition and acceptance of, and the value of, the System and the Marks for the benefit of Turf Management, Licensor and all *Weed Man* licensees in the United States. Section 4.3 requires Licensee to help to defray the costs of the Advertising Programs by paying a continuing advertising contribution to Licensor. The advertising contributions received from Licensee and other *Weed Man* licensees in the United States may be commingled with Licensor's general revenues, but will be administratively segregated on its books to form a fund (the "Advertising Fund"), which will be used by Licensor to conduct the Advertising Programs. Media costs, market research costs, production costs and all other costs and overhead incurred by Licensor in respect of the Advertising Programs shall be paid from the Advertising Fund. Licensor may retain an advertising agency to formulate, develop, produce and conduct the Advertising Programs and the cost of this shall be paid from the Advertising Fund. Licensee acknowledges that the Advertising Programs are intended to maximize general public recognition and acceptance of the *Weed Man* System for the benefit of all licensees in the System, and Licensor has no obligation to ensure that any particular licensee (including Licensee) benefits from the placement or conduct of the Advertising Programs, either directly or in proportion to his advertising contributions. Licensor has the absolute right to make all decisions regarding the mix of national and regional advertising, use of advertising contributions and media selection and content. Licensor may reimburse itself from the Advertising Fund for its administrative expenses of conducting the Advertising Programs and for administering the Advertising Fund. For as long as the Licensed right continues, Licensor will give Licensee an unaudited accounting of the receipts and disbursements of the Advertising Fund within 90 days after each fiscal year end of Licensor. In each fiscal year Licensor may decide to spend on the

Advertising Programs total amounts which are less than or which exceed the total contributions to the Advertising Fund for that year, may make loans at reasonable interest to the Advertising Fund to cover any deficits.

2.7    Equipment

Licensor may lease or buy and install all equipment required to operate the Licensed Business, in the name of and for the account of Licensee. The cost to Licensee of this equipment shall not exceed the wholesale market rate generally charged in the Territory at the time of sale for the similar quantities of items of comparable quality.

2.8    System Integrity

Licensor shall use reasonable efforts to ensure that all U.S. licensees operating within the System comply with the standards and specifications established by Turf Management and by Licensor for *Weed Man* licensees generally. However, Licensor may grant exemptions to particular licensees if, in its opinion, economic or other conditions pertaining to that licensee require such exemption.

2.9    Cost of Services

Except as specifically provided above or elsewhere in this Agreement, payment by Licensee for the above services is included in the initial license fee and royalty payments referred to in Article 4.

## 3 -    LICENSEE'S CONTINUING OBLIGATIONS

3.1    Exploit License Right

Licensee shall devote all of its time and attention to diligently and fully exploiting its rights under this Agreement in every manner, so as to promote and increase the demand for products and services being distributed by the System. Licensee shall not engage in any other business or activity without the prior written consent of Licensor.

3.2    System Standards and Manual

Licensee shall fully comply with all of the specifications, standards, operating procedures rules and policies which Turf Management or Licensor prescribe for the System from time to time, including without limitation those relating to:

(a)    types of products and services offered to customers;

(b)    supplies, equipment, products and other materials used in operating the Licensed Business, safety inspection, maintenance, cleanliness, function and appearance of such equipment and premises, and service agreements regarding these;

(c)    advertising and promotion;

(d)    use of the Marks, use of signs, posters, displays and similar items, and use of approved colors and uniforms;

(e)    soliciting new business, compiling customer lists, handling of customer complaints and other matters of customer relations; and

(f)    use and retention of standard forms.

Specifications, standards, procedures, policies and rules may appear in the *Weed Man* manuals referred to in Section 2.2 or in books, pamphlets, memoranda or other publications prepared by Turf Management or by Licensor for licensees generally or for Licensee in particular, such operating manuals and other writings being collectively referred to in this Agreement as the "Manual". All such specifications, standards, procedures, policies and rules (including those prescribed in the Manual) shall form a part of this Agreement as if they were specifically set out here, and the words "this Agreement" include all such specifications, standards and operating procedures. Turf Management or Licensor may amend the Manual from time to time. Licensee shall implement all such changes, and shall put the Manual change pages in their proper place in this copy of the Manual, and shall remove and destroy the superseded pages. If there is any conflict between Licensee's and Licensor's copy of the Manual, Licensor's copy shall prevail.

## 3.3    Vehicle Signs and Colors

All motor vehicles used by Licensee to conduct the Licensed Business shall be painted with the distinctive System color scheme and shall bear the lettering and insignia prescribed by Licensor and Turf Management from time to time. Licensee shall not make any alterations to this color scheme and identification without Turf Management's written consent.

## 3.4    Computer System

Licensee shall purchase or lease and install and maintain at its business office such microcomputer hardware, and shall acquire licenses for such operating and applications software, as Licensor generally prescribes for use in the System from time to time. Licensee shall execute Licensor's standard form of software license agreement for certain proprietary software owned by Licensor, and shall use such software in operating the Licensed Business.

## 3.5    Employee Training Program

Licensee shall hire all employees of the Licensed Business, and shall be responsible for the terms of their employment, their compensation and for their proper training in the operation of the Licensed Business. Licensee shall implement a training program for its employees in accordance with the training standards and procedures prescribed by Licensor from time to time. Licensee's employees must complete this training program to Licensor's satisfaction, and Licensor may require that any employee who cannot demonstrate adequate knowledge of Licensor's standards and procedures undergo reasonable retraining, at Licensee's expense.

## 3.6    Full-Time Manager

An employee of Licensee (the "Manager") designated by Licensee and approved by Licensor shall at all times act as the day-to-day manager of the Licensed Business, with full authority to make all decisions required of Licensee. The Manager shall devote full time and attention to the management and operation of the Licensed Business, and shall be on-site at Licensee's main business office during all times that the office is open for business, subject only to reasonable absence because of illness, vacation or similar cause acceptable to Licensor.

3.7   Approved Products, Equipment and Suppliers

Licensee acknowledges that an essential element of the System is the uniform quality of the equipment, products, supplies and material which must be used in operating the Licensed Business. Therefore Licensee shall purchase or lease and use in operating the Licensed Business only such equipment products, supplies and materials as have been approved by Licensor as meeting the minimum standards and specifications established by Turf Management and Licensor from time to time, and as have been purchased from suppliers approved by Licensor. If Licensee wishes Licensor to approve an item or supplier which has not previously been approved by Licensor as meeting its specifications and standards, Licensee shall so advise Licensor and on request of Licensor shall supply Licensor at Licensee's cost with such information and item samples as Licensor requires for examination and testing. Testing will be done by or for Licensor at Licensee's expense, and Licensor will advise Licensee within a reasonable time whether Licensor approves or disapproves the item or supplier. If Turf Management or Licensor revises any such standards or specifications (through revision of the **Weed Man** operations manuals or in any other way) with the result that an item previously purchased by Licensee no longer meets the standards and specifications, or if additional items are needed to meet the revised standard or specification, then within 30 days after receiving Notice from Licensor Licensee shall replace that item with one that conforms to the new standard and specification or shall purchase and install the required additional items. Licensee shall maintain its equipment in good order and repair and shall promptly replace any irreparable or obsolete item with the type then being prescribed by Licensee for new **Weed Man** licenses.

3.8   Pay Trade Creditors

Licensee shall promptly pay Licensor and the other suppliers of services, equipment, products, supplies and other items to the Licensed Business in accordance with the terms of supply. Licensee irrevocably authorizes Licensor (but without obligation on the part of Licensor) to advance to trade creditors of the Licensed Business, on behalf of Licensee, whatever amounts appear to Licensor to be required to keep Licensee in good standing with such creditors. Licensor may rely upon statements of account provided the trade creditors to Licensor as conclusive evidence of Licensee's account with those trade creditors and as to the terms of payment. All amounts so paid by Licensor shall be treated for all purposes of this Agreement as if the amounts were owing to Licensor by Licensee for direct purchases from Licensor.

3.9   Licensee's Local Advertising

Licensee shall actively advertise and promote Licensee's Business throughout the Territory. All advertising and promotion by Licensee will be completely factual and will conform to the highest standards of ethical advertising. Licensee shall not engage in any business or advertising practice which may injure the business of Licensor or its other licensees or the goodwill associated with the Marks. Without limitation, Licensee shall not conduct any unapproved advertising or promotion of

the Licensed Business (including media interviews or the use of unapproved coupon or other promotional schemes), nor use any unapproved advertising or promotional materials. Licensee shall submit to Licensor for approval prior to use all advertising and promotional materials prepared by or for Licensee. Any such materials which have not been approved by Licensor within 30 days after submission for approval shall be deemed disapproved by Licensor.

3.10    Customer Service

Licensee shall ensure that prompt, courteous and efficient service is given to customers at all times, and shall observe the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with customers, suppliers and the public. Licensee shall employ sufficient adequately-trained personnel to efficiently service all customers, shall maintain a sufficient stock of fertilizers, chemicals and other supplies to satisfy customer demand and shall otherwise operate Licensee's Business efficiently.

3.11    Customer Lists

By January 31 in each year Licensee shall provide Licensor with a computer diskette listing the names and addresses of all customers of the Licensed Business and shall update this on request of Licensor, to reflect changes to the customer base.

3.12    Insurance

Licensee shall obtain insurance coverage required herein by Licensor of such types in such amounts and with such insurers who are licensed by the state that the licensee does business in. Licensor requires that the licensee shall keep such coverage in force and in good standing for as long as the licensed right continues in effect.

Insurance carrier must be assigned no less than an A- rating by Bests'. In the event that required coverage cannot be obtained by acceptable insurers Licensor must be notified that coverage is not available and alternative insurers will be considered acceptable on a case basis.

Required insurance coverage includes, but is not limited to Herbicide/Pesticide Applicator's coverage, Product Liability including Completed Operations, Direct Damage coverage on the equipment, commercial automobile including Over-The Road Automobile Spill Clean-up coverage, Direct Damage coverage on equipment, furnishings, leasehold improvements, business interruption, loss of rents, crime, tenants liability, worker's compensation and employers liability.

All liability coverage forms and limits must comply with or exceed the minimum amounts required by the franchise agreement or regulatory department of licensees domiciled state issuing licensees permits or applicators licenses as individuals, corporations, or other legal entities.

Limits required by this agreement shall be no less than:

A. Commercial General Liability including Products Liability and Completed Operations including Herbicide/Pesticide Applicators endorsement. Annual Aggregate Limit - 1,000,000, per Occurrence Limit - 500,000.
B. Coverage must be on an "occurrence" basis. Deductibles (if any) on a "per occurrence" basis.

C. Commercial Automobile Liability coverage for any owned, leased, hired or borrowed automobile, including Spill Clean-up coverage when available.
Bodily Injury and Property Damage limits should be no less than 500,000 for any one occurrence.
Uninsured and Underinsured Motorists Protection, Medical Payments, and Statutory No-Fault coverage subject to the licensees state minimums must also be purchased.

D. Turf Holdings, Inc. should be added as an additional insured as the franchisor and be given a 30 day written notice of cancellation or notice of non-renewal by all insurers providing coverage for those types of coverage required above or by statute.

Licensee shall pay all insurance premiums as they are due, including Licensee's proportionate share of any blanket insurance premiums. Licensee shall ensure that Licensee's general liability coverage is not limited in any way because of any insurance maintained by Licensor. Licensee and Guarantors shall remain fully liable under their indemnities in this Agreement even though Licensee complies with the insurance requirements of this Section. Before Licensee starts its business operations Licensee shall give Licensor certified copies of policies or other acceptable evidence showing compliance with the requirements of this Section. At least ten days before an insurance policy is due to lapse Licensee shall give Licensor a renewal certificate confirming that the insurance has been renewed. If Licensee does not obtain or maintain the insurance required by this Section, or if Licensor receives notice from any insurer of impending cancellation or lapse of any insurance because of non-payment of premium or non-renewal by Licensee, Licensor may obtain the required insurance in the name of and on behalf of Licensee, and Licensee shall reimburse Licensor on presentation of invoice for all premiums and other charges paid or incurred by Licensor in placing such insurance.

### 3.13   Licenses and Permits

Licensee shall obtain and keep in force all licenses and permits required to operate the Licensed Business in full compliance with applicable laws, ordinances, by-laws and regulations, including government regulations relating to environmental protection, use and storage of hazardous products, occupational hazards and health, employment standards, consumer protection, unfair and deceptive practices, packaging and labeling, trade regulation, workers' compensation, unemployment insurance and withholding and payment of all taxes.

### 3.14   Repair

If in Licensor's opinion the general state of repair or the appearance of the equipment used in the Licensed Business does not meet the System standards and specifications, Licensor shall so advise Licensee in writing, specifying what Licensee must do to correct the problem. If Licensee does not correct the problem by completing the required such repairs, painting or decorating within 30 days after receiving Licensor's notice, Licensor may cause such repairs, painting or decorating to be done and Licensee shall reimburse Licensor on demand for Licensor's costs and expenses of so doing.

### 3.15   Inspections

Licensee shall allow Licensor's representatives to enter and inspect all premises from which Licensee conducts the Licensed Business any time during regular business hours without prior notice, and to examine and test equipment, furnishings, products and supplies to see if Licensee is

operating the Licensed Business in accordance with the requirements of this Agreement.  If Licensor notifies Licensee of any deficiency detected during inspection, Licensee shall diligently correct the deficiency.

### 3.16  Telephone Numbers

To facilitate the transfer of telephone numbers to Licensor under Subsection 9.2(c) on expiration or termination of the Licensed Right, whenever requested by Licensor during the term of the Licensed Right Licensee shall complete, sign and give to Licensor such undated transfer forms and directions regarding Licensee's telephone numbers and listings as Licensor may require.

### 3.17  Financial Statements

Franchisee must submit unaudited financial statements to Licensor within 30 days of Franchisees year end.

### 4 -  FEES AND PAYMENTS

### 4.1  Initial License Fee

On signing this Agreement Licensee shall pay to Licensor an initial license fee of $33,750. Credit against this fee will be given for any deposit previously paid to Licensor and still retained by Licensor.  This initial license fee is deemed to be fully-earned by Licensor upon payment by Licensee.

### 4.2  Continuing Royalty

As long as the Licensed Right continues in effect, in each calendar year Licensee shall pay to Licensor a continuing royalty and service fee based on the number of production vehicles used at any time during the year in the Licensed Business.  In each calendar year, for the first two production vehicles used by Licensee at any time during the year the royalty is $7,500 per production vehicle.  For the third production vehicle used by Licensee during the year, the royalty is $5,250.  For each subsequent production vehicle used by Licensee during the year, the royalty is $3,750 per production vehicle.  In each year these dollar amounts shall be adjusted for inflation by multiplying each of them by a fraction equal to the Consumer Price Index as published by the Department of Labor as of November 1 of the previous year divided by that index as of November 1, 1995.  However, the royalty and service fee for a calendar year shall never be less than $7,500.  Licensee shall pay the continuing royalty for the year to Licensor in eight equal monthly installments, commencing on March 1 of the year, and on February 15 of the year Licensee shall give Licensor eight post-dated checks for these installments.

4.3    Advertising Contribution

   To contribute to Licensor's cost of the Advertising Programs referred to in Section 2.6, for as long as the Licensed Right continues in effect Licensee shall pay to Licensor in each calendar year an advertising contribution based on the number of production vehicles used during the year in the Licensed Business. For each production vehicle used by Licensee in the year, the advertising contribution is 20% of the royalty and service fee payable on that vehicle. Except as provided in Section 4.4, the total advertising contribution for the year is payable in three equal monthly installments starting April 30, and on April 15 of the year Licensee shall give Licensor three post-dated checks for these installments.

4.4    Additional Vehicles

   If an additional production vehicle is used in the Licensed Business during a calendar year, the additional advertising contribution and additional royalty and service fee for the year shall be payable when the vehicle is delivered to Licensee.

4.5    Licensor Advertising Contributions

   Starting the year after this Agreement is signed, and for as long as the Licensed Right continues, Licensor will contribute in each year to the Advertising Fund referred to in Section 2.6 an advertising contribution equal one-half of the advertising contributions paid by Licensee for that year. Payment will be made in three equal monthly installments on the last day of the month, each installment to be paid the month after Licensee's corresponding advertising contribution clears.

4.6    Audit

   At any time during normal business hours, and without advance notice, Licensor may inspect the business books and records of Licensee, and of Guarantors to the extent that any of Guarantors' books and records pertain to the Licensed Business, and may cause these books and records to be audited. Books and records subject to inspection include (but are not limited to) bookkeeping and accounting records, invoices, purchase orders, payroll records, check stubs, bank deposit receipts, financial statements and tax returns of Licensee and of any person who has any direct or indirect ownership interest in Licensee. Licensee and Guarantors shall cooperate fully with representatives of Licensor and any independent accounting firm retained by Licensor to conduct any inspection or audit. If an inspection or audit discloses an underpayment by Licensee of any amount owing under this Agreement for the period or periods under review, Licensee shall pay the royalty and other amounts owing to Licensor and accrued interest on those amounts within ten days after receiving the inspection or audit report. If Licensor conducts an inspection or audit because Licensee did not provide a report, financial statement or other information required by this Agreement, or if an inspection or audit shows that Licensee has underpaid for any period by more than 3%, then Licensee shall reimburse Licensor for the cost of the inspection or audit, including the charges of any independent accounting firm and travel, room, board and compensation of employees of Licensor engaged in the inspection or audit.

4.7    Inquiry by Licensor

Licensee and Guarantors authorize Licensor during the time that the Licensed Right remains in effect to make reasonable inquiry from time to time of the bankers, suppliers and other trade creditors of the Licensed Business regarding their dealings with Licensee, and with the Guarantors to the extent that such dealings pertain to the Licensee or to the Licensed Business, to discuss the affairs, finances and accounts of the Licensed Business with Licensee's bankers and to obtain information and copies of records relating to any dealings between such persons and Licensee or Guarantors which are in any way connected to the Licensed Business. If requested, Licensee shall give Licensor such written instructions and authority as Licensor may require to allow such bankers, suppliers and other creditors to disclose such information and to release copies of such documents to Licensor.

## 5 -    USE OF THE MARKS

5.1    Integrity of Marks

Licensee shall operate the Licensed Business using the Marks without accompanying words or symbols of any kind. Licensee shall only use the Marks in association with the sale of wares and services approved in advance by Licensor in writing. Neither the Marks nor any words similar to the Marks may be used in any corporate or trade name used by Licensee or by any person in which Licensee has any direct or indirect interest. However, if required by applicable state law Licensee may register with the appropriate agency as operating under the assumed name "*Weed Man*".

5.2    Ownership and Use of Marks

Licensee acknowledges that Turf Management owns the Marks, and Licensee agrees not to represent that Licensee has any rights in the Marks except the right to use them as provided in this Agreement. Licensee agrees that all goodwill arising from Licensee's use of the Marks shall inure to and belong only to Turf Management. Licensee agrees never to engage in any conduct or practice which may tend to injure the goodwill of the business of Turf Management, the Licensor or any of their respective licensees. Licensee agrees never to directly or indirectly dispute or contest the validity or enforceability of the Marks, or to attempt to directly or indirectly depreciate the value of the goodwill associated with the Marks, or to counsel, procure or assist anyone else to do any of these things.

5.3    Infringement

Licensee shall immediately notify both Turf Management and Licensor of any infringement of the Marks by anyone else which comes to Licensee's attention, or of any challenge to Licensee's use of the Marks. Turf Management shall have the absolute right to decide whether or not it or any of its licensees or sub-licensees (including Licensee) may take action against the infringed or may defend against the challenge, and the absolute right to control any litigation or proceeding relating to any of the Marks. If, because of any such infringement or challenge, Licensor or Turf Management deems it advisable for Licensee to modify or discontinue the use of any of the Marks or to use one or more additional or substitute trademarks, Licensee shall do so and Licensor shall reimburse Licensee for the actual expenses reasonably incurred by Licensee in replacing signs or other printed material used in the conduct of the Licensed Business which bear the Marks to be

modified or discontinued. Licensee shall cooperate with and shall assist Turf Management, at Turf Management's expense, in prosecuting or defending any proceedings with respect to the Marks and shall execute such documents and do such other things as Turf Management deems necessary to a successful prosecution or defense.

## 6 -   RESTRICTIVE COMPETITION COVENANTS

### 6.1   Confidential Information

Licensee and Guarantors acknowledge that from time to time Licensor will disclose to them confidential information and trade secrets belonging to Licensor or to Turf Management, including certain parts of the Manual. Licensee and Guarantors jointly and severally agree not to use these secrets or information except to operate Licensee's Business in accordance with this Agreement, and not to disclose these secrets or information to anyone else except as permitted below in this Section. Without limitation, Licensee and Guarantors shall not copy any part of the Manual or disclose anything in the Manual to anyone else, except to those of Licensee's employees who need such disclosure in order to perform their jobs. However, any disclosure of the Manual contents to Licensee's employees may only be made in circumstances which will continue to legally protect the confidentiality of the information disclosed.

### 6.2   Non-Competition During Term

Licensee and Guarantors jointly and severally agree that for as long as the Licensed Right continues in effect none of them will directly or indirectly, in any manner or capacity whatever:

(a)   be engaged in, be concerned with or be interested in, or

(b)   advise, lend money to, guarantee the obligations of, or permit either of their names to be used by, any person who is engaged in, concerned with or interested in,

the development, operation, management or franchising of any business which derives more than 10% of its gross operating revenue from the provision of lawn care services, if that business is located within the Territory or within any of the other geographic areas set out in Section 6.3, unless done pursuant to a license agreement with Licensor which is in good standing.

### 6.3   Post-Term Competition

Licensee and Guarantors acknowledge that the business reputations of Turf Management and of Licensor, the methods and techniques employed by them, the knowledge of the services offered and methods used by the System and the opportunities, associations and experiences established and acquired by Licensee and Guarantors under this Agreement are of considerable value. Therefore, if the Licensed Right expires or terminates for any reason, or if Licensee assigns his interests in this Agreement, Licensee and Guarantors jointly and severally agree that for the time set out below after such termination, expiration, or assignment none of them will directly or indirectly in any manner or capacity whatever:

(c)   be engaged in, be concerned with or be interested in, or

(d)    advise, lend money to, guarantee the obligations of, or permit its or his name to be used by, any person who is engaged in, concerned with or interested in,

the development, operation, management or franchising of any business which derives more than 10% of its gross operating revenue from the provision of lawn care services, if that business is located within the Territory or within any of the other geographic areas set out below, unless done pursuant to a license agreement with Licensor which is in good standing.

Time Period:          24 months

Geographic Areas:    Clackamas County, Oregon

6.4    Solicitation of Customers and Employees

Licensee and Guarantors jointly and severally covenant that for as long as the Licensed Right continues in effect and for a period of two years after expiration, termination, or assignment of the Licensed Right:

(e)    none of them will attempt to obtain any unfair advantage over Turf Management,

(f)    over Licensor or over any of their respective licensees, by soliciting for employment any person whom any of those entities employ at the time, nor will either of them directly or indirectly induce any such person to leave such employment; and
none of them will divert or attempt to divert any business of or any customer of the Licensed Business to any other competitive business, by direct or indirect inducement or otherwise.

6.5    Deliver Covenants

On request of Licensor, Licensee shall give to Licensor the written covenants, in form satisfactory to Licensor, of all stockholders, directors, officers and employees of Licensee who at any time may exercise supervisory or management functions, or who may receive special training and instruction from Licensor, or who may acquire knowledge of any confidential information or trade secrets of Turf Management or of Licensor, undertaking to be bound by the provisions of this Article to the same extent as Licensee.

6.6    Acknowledgement

Licensee acknowledges that the System is unique and that covenants of the type in this Article are necessary to protect the System elements and the goodwill generated by licensees who use the System. Licensee also acknowledges that the scope of activity, the time periods and the geographic areas referred to in this Article were fully negotiated with Licensor and that these covenants are both reasonable as between the parties and consistent with the interests of the public.

## 7 -    ASSIGNMENT

### 7.1    By Licensor or Turf Management

Either Licensor or Turf Management may assign any of its rights under this Agreement, provided that the assignee agrees in writing to assume Licensor's or Turf Management's obligations which correspond to the rights assigned.  Upon such assignment and assumption Licensor or Turf Management shall be released from all further liability regarding those obligations.

### 7.2    By Licensee

No interest in this Agreement, in the Licensed Right, in the property and assets used to operate Licensee's Business or in Licensee may be sold, assigned, mortgaged, charged or in any other manner whatever (including by operation of law) transferred or encumbered (collectively, a "Transfer"), without the previous written consent of Licensor.  Without limitation, no interest in the subject matter of any Transfer may be retained by the vendor as security for any obligations that may arise as a result of the Transfer.  Any actual or purported Transfer without Licensor's written consent shall be a material default under this Agreement.  Licensor will not unreasonably withhold its consent to a Transfer.  In deciding whether to give or to withhold consent, Licensor will consider (among other things) the purchase price offered in comparison to the time remaining on the term of the Licensed Right, and the proposed transferee's character, credit standing, work experience and aptitude, financial background, community standing, apparent ability to properly manage a **Weed Man** business and to personally devote full time and best efforts to the business, residence in the locality, equity interest in the business, conflicting interests, and whatever other criteria and conditions Licensor applies at the time in deciding whether or not to grant a **Weed Man** to a new prospect.  In addition, Licensor may require as a condition of giving its consent that:

(a)    Licensee not then be in breach of this Agreement and have substantially complied with its obligations under this Agreement;

(b)    Licensee pay all amounts then owing to Licensor and to the trade creditors of the Licensed Business, settle all outstanding accounts with such creditors;

(c)    Licensee pay a transfer fee of $10,000 to Licensor and reimburses Licensor for all of its costs and expenses incurred in connection with the proposed transfer, including all administrative and legal costs and the cost of training the proposed transferee;

(d)    Licensee and Guarantors sign Licensor's standard form of release, by which they fully release Licensor, Turf Management and their directors and officers from all claims;

(e)    the proposed transferee and its owners sign a new license agreement and other documents (including stockholder guarantees) for the balance of the term of this Agreement, in the forms then being used by Licensor to grant new **Weed Man** licenses.  However, the proposed transferee will not be required to pay an initial license fee or a higher royalty and service fee, or make greater advertising contributions than are required under this Agreement;

(f)    if required by Licensor, the proposed transferee and its employees complete to Licensor's satisfaction its training program then in effect for new licensees; and

(g)    the transfer comply with all applicable bulk sales legislation.

Without limitation, Licensor has the absolute right to withhold consent to a transfer if Licensor believes that the purchase price to be paid by the proposed transferee is so large that the proposed transferee will be unlikely to realize an adequate return on investment within a reasonable time.

### 7.3    Death or Disability

If one of the Guarantors dies or becomes permanently disabled before termination or expiration of the Licensed Right, then within 60 days thereafter he or his estate shall transfer all of his stock in Licensee to the surviving Guarantors on such terms and conditions as they may agree upon.  If the last surviving Guarantor dies or becomes permanently disabled before termination or expiration of the Licensed Right, then within 60 days thereafter Licensee shall transfer all of Licensee's rights under this Agreement and in the assets used to operate Licensee's Business to a third party reasonably acceptable to Licensor, having regard to the criteria for transferees set out in Section 7.2.  Licensor may (but need not) operate and manage Licensee's Business for the account of Licensee until the transfer of the Licensed Right to an acceptable third party is completed.  If Licensor chooses to operate and manage Licensee's Business, Licensee shall pay a reasonable management fee to Licensor and shall reimburse Licensor for its reasonable expenses.  Licensor shall account on a regular basis for its operation of Licensee's Business, and shall pay the net income from such operation to Licensee after deducting its management fee and expenses.  A Guarantor shall be deemed permanently disabled if the Guarantor's normal participation in the operation of Licensee's Business is diminished for a cumulative period of 90 days in any twelve-month period because of mental or physical disability.  The requirements of Section 7.2 shall apply to any transfer under this Section.

### 7.4    Right of First Refusal

Without limiting Licensor's rights under Section 7.2, if Licensee receives a bona fide offer (the "Offer") to acquire the Licensed Right or any interest in this Agreement which Licensee wishes to accept, Licensee shall promptly give Licensor a true copy of the Offer and full details of the proposed purchaser.  During the 30 days after Licensor receives the Offer and details it may purchase the property forming the subject matter of the Offer on the same terms and conditions as those in the Offer, except that Licensor may deduct from the purchase price the amount of any broker's or agent's commission or fee that is payable under the Offer, may substitute the reasonable cash equivalent of any other form of consideration specified in the Offer, and may if it chooses may pay the purchase price in full at closing.  If Licensor decides not to buy, and if the requirements of Section 7.2 are met, Licensee may complete the transfer in accordance with the Offer.  However, if the transfer is not completed within 30 days after Licensor notifies Licensee of its consent to the transfer, then the provisions of this Section shall again apply regarding the proposed transfer, and so on from time to time.

## 8 -    TERMINATION

### 8.1    Default

Licensee will be in default under this Agreement if any one or more of the following happen:

(a)      Licensee engages in any conduct or practice that Licensor reasonably believes may reflect unfavorably on or be otherwise detrimental to the goodwill associated with the Marks.

(b)      Licensee does not pay Licensor when a payment is due.

(c)      Licensee uses in the Licensed Business a product, item of equipment or material which does not meet the System specifications and standards, or sells any unauthorized product or service, or refuses to use a product, item of equipment or material which Licensor designates for use in the System.

(d)      Licensee does not obtain a government approval, permit or license needed to establish and operate the Licensed Business.

(e)      Licensee otherwise breaches this Agreement.

Licensee has ten days after it receives notice of default under Subsection (a) or (b), 15 days after it receives notice of default under Subsection (c), and 30 days after it receives notice of any other default (except as stated in Section 8, 8.2) in which to cure the default.

8.2   <u>Termination</u>

Licensor may terminate the Licensed Right and all other rights of Licensee and Guarantors under this Agreement, effective when Licensor sends notice of termination to Licensee or at such later date as required by law or as stated in the notice, if:

(f)      in negotiating for this Agreement Licensee or any of Guarantors misstated a material fact to Licensor, or did not state a material fact with the result that another statement of material fact which they did make to Licensor was misleading; or

(g)      Licensee does not cure a default as provided in Section 8.1; or

(h)      Licensor terminates another *Weed Man* license agreement with Licensee or with any of Guarantors for cause; or

(I)      Licensee or any of the Guarantors generally fails to pay debts as they become due in the ordinary course of business, or becomes subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition with creditors or a similar action or proceeding that is not dismissed within 30 days after it is filed, or if Licensee or any of the Guarantors otherwise attempts to take the benefit of any federal or state law now or subsequently in effect for the relief of debtors; or

(j)      a sheriff or other official levies execution or similar process against any assets needed to operate the Licensed Business or against any ownership interest in Licensee, or Licensee sells any substantial part of its business assets out of the ordinary course of business; or

(k)      Licensee discontinues operating the Licensed Business; or

(l)      Licensee or any of the Guarantors breaches a restriction imposed by either Article 6 or Article 7; or

    (m)    Licensee receives in any 12-month period three or more notices of default from Licensor, whether the notices relate to the same or to different defaults and whether or not the defaults are cured.

### 8.3    Partial Return of Money

If Licensor terminates under Section 8.1(d), then Licensor and Turf Management on the one hand, and Licensee and Guarantors on the other, shall sign a full mutual release of all claims each group has against the other, except for claims under Article 6, in form satisfactory to Licensor. Licensor shall then refund to Licensee all amounts paid by Licensee on account of the initial franchise fee, less the greater of $2,500 and Licensor's actual costs and expenses incurred in connection with the Licensed Right to date of termination.

## 9 -    CONSEQUENCES OF TERMINATION

### 9.1    Stop Using System

If the Licensed Right expires or is terminated for any reason (a "Termination") then Licensee shall immediately stop using the System and the Marks. After Termination Licensee and Guarantors shall not identify themselves to the public as being former *Weed Man* licensees.

### 9.2    De-Identify Business

Within three days after a Termination Licensee shall:

    (a)    cancel all of its assumed name or equivalent public registrations which refer to any of the Marks, destroy all written materials it has which bear any of the Marks, remove the Marks from all of Licensee's vehicles, equipment and signs, and make such other changes to the external appearance of Licensee's vehicles as Licensor reasonably requires to minimize their identification with the System;

    (b)    return all of its copies of the Manual to Licensor;

    (c)    advise the telephone company and all classified and other listing agencies in writing that Licensee is no longer authorized to use the Marks, require the telephone company to immediately transfer to Licensor all telephone numbers of Licensee which are listed using the Marks, require the listing agencies to cancel all such listings as soon as possible, and do whatever they may require to complete such transfer and cancellations; and

    (d)    give Licensor an accurate list of the names and addresses of all customers of Licensee during the previous 12 months.

### 9.3    Pay Creditors

If the Licensed Right expires or is terminated for any reason then within seven days Licensee shall pay all amounts then owing by it to Licensor and to the other trade creditors of the Licensed Business (including anything owing to Licensor under Section 3.8).

### 9.4    Purchase Option

For 30 days after Termination Licensor has the option to purchase such fixtures, vehicles, equipment, signs, supplies, materials and merchandise used in the Licensed Business as Licensor designates. If Licensor exercises this option then Licensee shall sell the designated items to Licensor for such purchase price as they agree upon, or if they cannot agree within ten days, then for fair market value as determined by an independent appraiser selected by Licensor. The purchase price shall not contain any factor or increment for goodwill or other intangibles. Licensor may set off against the purchase price all amounts then owing by Licensee to Licensor (whether or not under this Agreement) and half of the appraiser's charges for appraising the assets. If Licensor exercises its purchase option, the sale shall be completed within five days after the purchase price is determined, and Licensee shall do whatever is required under any applicable bulk sales legislation to allow Licensor to pay the full purchase price directly to Licensee on closing. At closing Licensee shall give Licensor a bill of sale with the usual covenants as to title, and such other documents as Licensor may reasonably require to complete the sale transaction.

### 9.5    Powers of Licensor

If Licensee does not do something it is required by this Article to do, then without affecting Licensor's other rights Licensor may sign any document and do anything else, on behalf of and in the name of Licensee, as is needed to fully carry out the intent of this Article. Licensee irrevocably appoints the president of Licensor at that time as Licensee's attorney-in-fact to sign all such documents and to do all such things, and agrees to ratify and confirm whatever Licensor's president does under this power of attorney. In addition, Licensor has the full authority of Licensee to enter the premises of the licensed business and remove signs baring the trademarks from vehicles and change vehicle colors, if Licensee has not done so within 10 days of written notice.

### 9.6    Equitable Relief

Licensee acknowledges that its delay or refusal to discontinue all use of the Marks on Termination will cause serious loss and damage to Licensor, which may be impossible to measure monetarily. Accordingly, Licensor is entitled to injunctive relief, restraining and enjoining any such use.

## 10 -    GENERAL CONTRACT PROVISIONS

### 10.1    Indemnification

Licensee indemnifies Licensor on a full recovery basis (including all attorneys fees and disbursements) against all liability, loss, damages, costs and expenses which Licensor may sustain, suffer or incur as a result of Licensee's breach of this Agreement or as a result of any act or

omission of Licensee or anyone for whom Licensee is responsible in law, or as a result of the operation of the Licensed Business.

### 10.2   Security

To secure payment and performance of all obligations owing by Licensee to Licensor or to Turf Management (whether or not owing under this Agreement), within ten days after Licensor's request Licensee shall sign Licensor's standard form of security agreement and shall deliver it to Licensor.

### 10.3   Overdue Amounts

All amounts owing by Licensee to Licensor or to Turf Management (including amounts owing under this Agreement) shall bear interest after the due date until paid in full at the Prime Bank Rate plus 5%, compounded and payable weekly, not in advance, before and after default, maturity and judgment, with interest on overdue interest at the same rate.  The Prime Bank Rate shall be determined at the close of business on the day before each interest payment is due and shall apply to all amounts owing at that time.  "Prime Bank Rate" means the commercial lending rate of interest (expressed as an annual rate) quoted by the Wall Street Journal from time to time as the reference rate of interest (commonly known as "prime") for the purpose of determining the rate of interest that it charges to its commercial customers for U.S. Dollar loans.

### 10.4   Currency and Payment

All money amounts in this Agreement are expressed in U.S. Dollars.  A check or other commercial paper does not constitute payment of an obligation until payee receives cash or credit for its full face value.

### 10.5   No Set-Off

Neither Licensee nor any of the Guarantors shall withhold payment of any amount owing to Licensor or to Turf Management because of any alleged non-performance by either of them.  If Licensee does not pay an amount owed by it to Licensor to Turf Management when it becomes payable, then Licensor may pay itself or Turf Management the amount owed out of any money or credit held by Licensor for Licensee's account.

### 10.6   Notice

To be effective, a notice or other communication ("Notice") which is required or permitted by this Agreement to be given by one party to another party must be in writing, and must be given by personal or courier delivery, or by prepaid registered or certified mail.  The present addresses of the parties for delivery are stated on page 1 of this Agreement.  A party may change his address for service by giving Notice of the change to the other parties.  Notice which is given by mail shall be deemed to be received three days after it is mailed, unless it was actually received earlier.  If postal service is interrupted by strike or other irregularity then during the interruption Notice may not be given by mail.

10.7    Governing Law

This Agreement is executed in the state of Washington and shall be governed by and interpreted in accordance with the laws of the state of Washington. Licensee and Guarantors agree that they shall be subject to the jurisdiction of any court in the State of Washington in the event legal action is commenced to enforce the terms of this Agreement.


10.8    Entire Agreement

This Agreement is the entire agreement and understanding between the parties regarding its subject matter, and supersedes all previous agreements and understandings between the parties regarding that subject matter. None of the parties is relying on any representation, warranty, inducement, promise or other assurance (express or implied, oral or written, statutory or otherwise) which may have been made or given previously by another party or by anyone else, concerning either this Agreement or the venture contemplated by this Agreement, unless it is specifically stated in this Agreement or in the schedules. This Agreement may only be amended by a written agreement signed by all of the parties.


10.9    Third Party Beneficiaries

The parties intend that Turf Management be a third party beneficiary of this Agreement. There are no other third party beneficiaries, and no agreement between Licensor or Turf Management and anyone else is for Licensee's or Guarantors' benefit.


10.10   Force Majeure

No party shall be responsible to another party for non-performance or for delay caused by anything beyond his control, including without limitation acts or omissions of another party, strike, lock-out, act of civil or military authority, embargo, insurrection, war or act of God. If any such delay occurs, then any applicable time period shall be extended for a period equal to the time lost, as long as the affected party makes reasonable efforts to perform and gives prompt notice of the delay to the other parties. The inability of a party to obtain funds is not an event to which this Section applies.


10.11   Number and Gender

In this Agreement, the use of the singular number includes the plural and vice versa, use of a particular gender includes all of the other genders and the word "person" includes an individual, a partnership, a trust, a personal representative, a body corporate and politic, an association and any other incorporated or unincorporated organization or entity.

10.12  Table of Contents and Headings

The table of contents, the use of headings and the division of this Agreement into Articles and Sections are all for the convenience of the reader, and shall not affect the legal interpretation of this Agreement.

10.13  Independent Contractors

The parties are independent contractors, and nothing in this Agreement gives any party the right to bind another party to any obligation, or to assume or to incur any obligation on behalf of or in the name of another party. This Agreement shall not be interpreted to make one party a partner, joint venturer, employee, agent or other representative of another party for any purpose. Each party shall use his own name when soliciting, negotiating and completing contracts, so that the transaction indicates that he is acting on his own behalf and not for any other party.

10.14  Cumulative Remedies

The remedies available to a Licensor under this Agreement are intended to be cumulative and not in the alternative, and exercise of any remedy shall not prevent Licensor from seeking any other remedy which may be available.

10.15  Waiver

Licensor shall not be deemed to have waived its right to enforce any obligation of Licensee or of Guarantors under this Agreement unless the waiver is in writing signed by Licensor. If Licensor accepts part performance by another party of an obligation under this Agreement, or accepts payment of principal, interest or anything else from another party, that shall not be construed as a waiver by Licensor of any right under this Agreement. No waiver by Licensor of any breach of this Agreement shall act as a waiver of its rights regarding a similar but subsequent breach or any other breach of this Agreement.

10.16  Severability

Each part of this Agreement is intended to be separately valid and enforceable to the fullest extent permitted by law. No part of this Agreement shall be interpreted as being dependent upon any other part unless the contrary is expressly stated. If any part of this Agreement cannot be enforced because of any rule of law or public policy, the offending material shall be severed, but that shall not affect the remainder of this Agreement.

10.17  Time of the Essence

Time is of the essence of this Agreement. When calculating the period of time within which or following which any act is to be done or any step taken pursuant to this Agreement, the reference date for calculating the period shall be excluded. If the last day of any such period is not a business day then the period shall end at the close of business on the next business day.

10.18  Further Assurances

On request of a party and at that party's expense, each of the other parties shall do such things, execute such documents and give such further assurances as the requesting party may reasonably require to fully carry out the intent of this Agreement.


10.19  Successors

This Agreement shall inure to the benefit of and shall bind the parties and their heirs, executors, administrators, successors and permitted assigns.


## 11 -    GUARANTY AND INDEMNITY

As an inducement to Licensor and to Turf Management to sign this Agreement, Guarantors jointly and severally, irrevocably and unconditionally guarantee to Licensor and to Turf Management that all of Licensee's present and future obligations of any nature owing to them, including obligations under this Agreement, will be punctually paid and performed.  Either Licensor or Turf Management may extend, modify or release any indebtedness or obligation of Franchisee owing to them, or may settle, adjust or compromise any claim against Licensee, without notice to Guarantors and without affecting a Guarantor's obligation under this guaranty.  This guaranty shall also bind the Guarantors' estates.  Guarantors will not seek or accept indemnity and will not claim reimbursement or subrogation under this guaranty until all obligations of Licensee to Licensor and to Turf Management have been fully paid and performed.  Guarantors waive notice and demand by Licensor on Licensee for performance by Licensee.

In addition to the above guaranty, and as primary obligations which are entirely separate from the above guaranty, Guarantors jointly and severally indemnify Licensor and Turf Management on a full-recovery basis against all liability, loss, damages, costs and expenses (including attorneys' fees and disbursements) which either of them may sustain or incur as a result of Licensee breaching any obligation to either of them, including obligations to them under this Agreement.


## 12 -    ACKNOWLEDGMENTS

12.1    Independent Investigation and Advice

Licensee and Guarantors acknowledge that they have had adequate opportunity to seek independent advice from legal and other professional advisors of their choice regarding all aspects of this Agreement and the business relationship contemplated by it, recognize that this business venture involves risk, and understand that its success will be largely dependent on their business ability.

12.2    <u>Volume Rebates</u>

Licensee and Guarantors acknowledge that Licensor and Turf Management may retain for themselves the full benefit of any volume rebate, discount, advertising allowance or other concession received by them from anyone as a result the supply of goods, vehicles, products or services to any the **Weed Man** licensees, without any obligation to disclose or to account to Licensee. Licensor and Turf Management have the absolute right if they wish to share all or any part of these rebates, discounts, allowances or concessions with any **Weed Man** licensee or group of **Weed Man** licensees on whatever basis Licensor or Turf Management wish.

IN WITNESS WHEREOF the parties have executed this Agreement this first (1st) day of November, 1996.

**LICENSOR: TURF HOLDINGS INC.**

By: _____         Attest: _____
     President                           Secretary

**LICENSEE NAME: HUNT-KESTEK CORP**

By: _____         Attest: _____
     President                           Secretary

**Guarantors:**

_____         Witness: _____

_____         Witness: _____

_____         Witness: _____

**SCHEDULE "1"**
**MARKS**

| Mark | Registration Number | Date of Registration |
|---|---|---|
| THE WEED MAN | 1,125,439 | September 25, 1979 |

**SCHEDULE "2"**
**TERRITORY**

**Oregon - Franchise # 2**

# Lake Oswego

## Boundaries   (see map)

| | |
|---|---|
| Northern: | Clackamas County northern boundary line |
| Eastern: | Clackamas County eastern boundary line |
| Western: | Clackamas County western boundary line |
| Southern: | Clackamas County southern boundary line |

# EXHIBIT B

TURF HOLDINGS, INC.
ASSIGNMENT CONSENT AGREEMENT

This Assignment Consent Agreement, made and effective the latter of the dates signed below, is between Turf Holdings, Inc., a Delaware corporation having its principal place of business in Scarborough, Ontario ("Franchisor"); Luther L. Vanderburg ("Vanderburg"); and Vanderburg Corporation with principal offices in Tigard, Oregon ("Franchisee").

WHEREAS, Franchisor granted Franchisee (then named Hunt-Kestek Corporation) a Franchise Agreement dated November 1, 1996 for the operation of a Weed Man franchised business in Oregon (the "Franchise Agreement");

WHEREAS, Franchise changed its name to Hunt-Vanderburg Corporation, and subsequently changed its name a second time on January 1, 2002 to the current name, Vanderburg Corporation;

WHEREAS, the ownership of the Franchisee has changed so that the current owner of 100% of the Franchisee entity is Vanderburg, and Vanderburg has agreed to execute a personal guarantee of the obligations of Vanderburg Corporation under the Franchise Agreement;

WHEREAS, pursuant to the provisions of the Franchise Agreement, the transfer to Vanderburg is subject to the consent of Franchisor and Franchisor's Right of First Refusal on the same terms; and

WHEREAS, Franchisor wishes to consent to the ownership transfer to Vanderburg, and ratify the current standing of Vanderburg Corporation as the Franchisee of record;

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this agreement agree as follows:

1. Representations.

A. Vanderburg represents to Franchisor that it:

1. Owns all right, title, and interest in and to Franchisee.

B. Vanderburg and Franchisee represent and warrant to Franchisor that they each have the authority to execute this Agreement.

2. <u>Consent</u>. Franchisor consents to the transfer of Franchisee ownership rights to Vanderburg and waives its Option To Purchase under the terms of the Franchise Agreement, if:

A. Vanderburg enters into a continuing Guaranty Agreement in the form attached to this Agreement, guaranteeing all liabilities and obligations of Franchisee under the Franchise Agreement and agreeing to be bound individually by the covenants contained in the Franchise Agreement relating to non-competition and confidentiality.

B. Franchisor waives any transfer fee otherwise due and payable under the Franchise Agreement in relation to the transfers described above.

3. <u>Indemnification and Warranties</u>. Vanderburg and his successors, assigns, and agents, shall indemnify and hold harmless Franchisor and any of its subsidiaries, successors, assigns, officers, directors, employees and agents, and each of them, against:

A. Any and all liabilities, losses, damages, deficiencies, claims, costs, or expenses of any nature resulting, directly or indirectly, from:

1. Any misrepresentations or breach of warranty or covenant on the part of Vanderburg under this Agreement or otherwise;

2. The nonfulfillment of any conditions under this Agreement or otherwise; and

3. The transfer of ownership interests in the Franchisee, rights under the Franchise Agreement, and the assets of the Franchised Business; and

B. Any and all actions, suits (third party or otherwise), proceedings, investigations, demands, assessments, judgments, costs and expenses incident to the foregoing, including but not limited to, reasonable legal and accounting fees.

5. <u>General Release</u>. Vanderburg and Franchisee, their heirs, successors, representatives, and assigns, do hereby remise, release and forever discharge Franchisor and its affiliates and divisions and their respective successors, assigns, directors, officers, shareholders, and employees, of and from any claims, debts, liabilities, demands, obligations, costs, expenses, actions and causes of action of every nature, character and description, which

-2-

Vanderburg, Franchisee or any of them, now owns or holds, or at any time owned or held, or may at any time own or hold, arising prior to and including the date of this General Release. Vanderburg, Franchisee and each of them hereby represent that no third party has or claims any interest in any claim released by this General Release.

6. <u>Transfer</u>.  This Agreement is not transferable by Vanderburg or Franchisee.

7. <u>Joint and Several</u>.  If Vanderburg or Franchisee consists of more than one individual or entity, their liability under this Agreement shall be deemed to be joint and several.

8. <u>Severability and Substitution</u>.  Each term and provision of this Agreement is severable from all others.  If, for any reason, a portion of this Agreement is held to be invalid or contrary to or in conflict with any applicable law, such ruling will not have any effect on other portions of this Agreement.

9. <u>Integrated Agreement</u>.  This Agreement represents the entire understanding between the parties and supersedes any previous understanding relating to the subject of this Agreement. This Agreement may be modified by a writing signed by all parties.

10. <u>Waiver</u>.  A waiver by any party to this Agreement shall not be considered as a waiver of any subsequent default or breach of the same or other provisions of this Agreement.  The failure by any party to this Agreement to object to, or to take affirmative action with respect to, any conduct of the other which is in violation of this Agreement shall not be construed as a waiver thereof, or of any future breach or subsequent wrongful conduct.

11. <u>Execution in Counterparts</u>.  This Agreement will be considered enforceable even if separate copies are executed, so long as both parties receive an executed copy from the other party.

(The rest of this page is intentionally blank)

-3-

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates shown, intending to be legally bound.

**LUTHER L. VANDERBURG:**

Witness:

Date: 3-8-05

**VANDERBURG CORPORATION**

Attest:

By: _____ III
Luther L. Vanderburg, Its President

Date: 3-8-05

**TURF HOLDINGS, INC.**

Attest:

By: _____
Don Dankowich, Its President

Date: 4/13/05

-4-

# EXHIBIT C

## GUARANTY AGREEMENT

IN CONSIDERATION of the acceptance by Turf Holdings, Inc., a Delaware corporation having its principal place of business in Scarborough, Ontario (hereinafter called "Franchisor"), of a Franchise Agreement transferred to and executed by Luther L. Vanderburg as an officer of Vanderburg Corporation, a corporation organized under the laws of the state of Oregon (hereinafter called "Franchisee"), and for other good and valuable consideration, I, we and each of us jointly, severally, absolutely and unconditionally guarantee to Franchisor, (i) the payment and satisfaction of each and every claim, demand, default, liability, indebtedness, right or cause of action of every nature whatsoever, against said Franchisee, including expenses, damages and fees, now or hereafter existing, due or to become due, or held by Franchisor, its subsidiaries, affiliates or divisions, together with any interest as it may accrue and if this continuing guaranty is placed with an attorney or if collected by suit or through any probate, bankruptcy or other court, to pay all court costs and reasonable attorney's fees, together with any and all expenses incurred by Franchisor or its affiliate, subsidiary or division; and (ii) the timely performance of each term, covenant and obligation of the Franchisee set forth in the Franchise Agreement. This is a continuing guaranty which shall apply to the Franchise Agreement and any subsequent amendments or modifications thereof, and such modifications or amendments shall be conclusively presumed to be covered by this guaranty without further notice to or acceptance by the undersigned.

The undersigned acknowledge and agree that possession of this guaranty by Franchisor constitutes true and correct execution and actual and proper delivery of same to Franchisor and the undersigned waive notice of acceptance of this guaranty and of any liability to which it applies or may apply, and waive presentment thereof, collection thereof including any notice of default in payment thereof, collection thereof including any notice of default in payment thereof or other notice to, or demand of payment therefor on, any party. Payment by the undersigned shall be made at the office of Franchisor at 11 Grand Marshall Drive, Scarborough, Ontario M1B 5N6 Canada, or such other location as Franchisor may designate in writing.

Franchisor may, at its option, at any time without the consent of or notice to the undersigned, without incurring responsibility to the undersigned, and without impairing or releasing the obligations of the undersigned, upon or without any terms or conditions and in whole or in part, (1) change the manner, place or terms of payment or change or extend the time of payment of, renew, or alter any liability of the Franchisee under the franchise agreement hereby guaranteed, or any liabilities incurred directly or indirectly hereunder, and the guaranty herein made shall apply to the liabilities of the Franchisee, so changed, extended, renewed or altered; (2) exercise or refrain from exercising any rights against Franchisee or others, or otherwise act or refrain from acting, (3) settle or compromise any liabilities hereby guaranteed or hereby incurred, and may subordinate the payment of all or any part of such liabilities to the payment of such liabilities to the payment of any liabilities which any liability or liabilities of Franchisee to Franchisor regardless of what liability or liabilities of Franchisee to Franchisor remain unpaid. Franchisor may, at its option, without the consent of or notice

- 1 -

to the undersigned, apply to the payment of the liability created by this guaranty, at any time after such liability becomes payable, any monies, property, or other assets belonging to the undersigned in the possession, care, custody and control of Franchisor.

This agreement shall not affect in any manner the right of Franchisor to terminate the Franchise Agreement pursuant to the terms thereof and this guaranty shall survive the termination, expiration, or cancellation of the Franchise Agreement. Franchisor may, at its option, elect to take no action pursuant to this guaranty or the franchise agreement without waiving any rights under either. The undersigned do further agree that it will not be necessary for Franchisor, in order to enforce the terms of this Agreement against them, to first institute suit or exhaust its remedies against the Franchisee or any others. The foregoing guaranty shall be nonrevocable, except with the express written consent of the Franchisor.

The undersigned, if more than one, shall be jointly and severally liable hereunder and the term "undersigned" shall mean the undersigned or any one or more of them. Anyone signing this guaranty shall be bound thereto at any time. Any married woman who signs this guaranty hereby expressly agrees that recourse may be had against her separate property for all her obligations under this guaranty.

This guaranty shall bind and inure to the benefit of the heirs, executors, administrators, successors and assigns of Franchisor and the undersigned. This agreement in the possession of the Franchisor will be presumed that same has been executed and delivered by each of the undersigned for a valuable consideration.

Additionally, the undersigned agree they shall be individually bound by the provisions of the Franchise Agreement relating to non-competition and confidentially.

WITNESS our hands at _____, on this the 8th *MARCH, 2005* day of ~~June, 2004.~~

Witness:

_____

_Luther L Vanderburg_

Luther L Vanderburg, Individually

Date: _3-8-05_

Witness:

_____

_Teri Anderson_

Name printed: _TERI ANDERSEN_

Date: _3-8 05_

STATE OF _OREGON_ )

COUNTY OF _WASHINGTON_

    Subscribed and sworn to before me this _8_ day of _MARCH_, 20_05_

by _____.

My Commission expires
_5-31-08_ .

```
        OFFICIAL SEAL
        ROBERT O NELSON
      NOTARY PUBLIC OREGON
      COMMISSION NO. 381298
   MY COMMISSION EXPIRES MAY 31, 2008
```
Notary Public

- 3 -